**In re IKON OFFICE SOLUTIONS, INC. SECURITIES LITIGATION.**

No. MDL 1318.
No. 98–CV–4286.

United States District Court,
E.D. Pennsylvania.

Feb. 6, 2001.

Deborah R. Gross, Law Offices of Bernard M. Gross, Philadelphia, PA, Robert P. Frutkin, Savett, Frutkin, Podell and Ryan, P.C., Philadelphia, PA, Lynn Lincoln Sarko, Britt L, Tinglum, Keller Rohrback, Seattle, WA, Jerome M. Congress, Justin C. Frankel, Milberg, Weiss, Bershad, Hynes & Lerach LLP, New York City, Douglas Risen, Berger & Montague, Philadelphia, PA, Patrick Slyne, Stull, Stull & Brody, New York City, for Philip Cohen, Sandra Cohen, plaintiffs.

Todd S. Collins, Berger & Montague, P.C., Philadelphia, PA, Jules Brody, Aaron L. Brody, Stull, Stull & Brody, New York City, Jared Specthrie, Samuel H. Rudman, Lee A. Weiss, Jerome M. Congress, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Robert P. Frutkin, Savett, Frutkin, Podell and Ryan, P.C., Philadelphia, PA, Lynn Lincoln Sarko, Britt L, Tinglum, Juli E. Farris, Keller Rohrback, Seattle, WA, for Randy Leach, Judy Leach, plaintiffs.

Todd S. Collins, Berger & Montague, P.C., Philadelphia, PA, Jules Brody, Aaron L. Brody, Stull, Stull & Brody, New York City, Jared Specthrie, Samuel H. Rudman, Lee A. Weiss, Jerome M. Congress, Justine C. Frankel, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Robert P. Frutkin, Savett, Frutkin, Podell and Ryan, P.C., Philadelphia, PA, Lynn Lincoln Sarko, Britt L, Tinglum, Juli E. Farris, Keller Rohrback, Seattle, WA, for Oliver Scofield, Dan Watson, Frederick L. Goldfein, Stanley Knapp, Lawrence Porter, Gerald J. Galiger, plaintiffs.

Eleanor Morris Illoway, Harkins Cunningham, Philadelphia, PA, Rory O. Millson, Alan J. Hruska, Thomas G. Rafferty, Gerald A. Ford, Miriam Hechler Baer, Andrew G. Gordon, Cravath, Swaine & Moore, New York City, John G. Harkins, Jr., David J. Creagan, Harkins Cunning-

ham, Philadelphia, PA, for Ikon Office Solutions, Inc., James J. Forese.

Lawrence T. Hoyle, Arlene Fickler, Michael T. Starczewski, Hoyle, Morris and Kerr, Philadelphia, PA, for John E. Stuart, defendant.

Eleanor Morris Illoway, Harkins Cunningham, Philadelphia, PA, Rory O. Millson, Alan J. Hruska, Thomas G. Rafferty, Gerald A. Ford, Miriam Hechler Baer, Andrew G. Gordon, Cravath, Swaine & Moore, New York City, John G. Harkins, Jr., David J. Creagan, Harkins Cunningham, Philadelphia, PA, for Kurt E. Dinkelacker, Michael J. Dillon, movants.

Rory O. Millson, Miriam Hechler Baer, Andrew G. Gordon, Cravath, Swaine & Moore, New York City, for William F. Drake, movant.

Jeffrey H. Lowenthal, Steyer Lowenthal Boodrookas & Walker, San Francisco, CA, for Class Members.

Jacob A. Goldberg, Berger and Montague, P.C., Philadelphia, PA, Lynn Lincoln Sarko, Keller Rohrback, Seattle, WA, for Philadelphia Group, movant.

Jonathan C. Medow, Mayer, Brown and Platt, Chicago, IL, Marc Gary, Gary A. Orseck, Kathryn Schaefer, Lawrence S. Robbins, Lily Fu Swenson, Mayer, Brown & Platt, Washington, DC, Edward M. Posner, Renee Narducci Battisti, Drinker, Biddle & Reath, LLP, Philadelphia, PA, for Ernest & Young, LLP, movant.

E. Graham Robb, Weber Goldstein Greenberg & Gallagher, Philadelphia, PA, for Julia Whetman, Judy Peterson, movant.

Andrew B. Clauss, Cozen and O'Connor, Philadelphia, PA, Charles J. Glasser, Jr., Richard L. Klein, Willkie, Farr & Gallagher, New York City, for Bloomberg News, movant.

Christine G. Boyle, Marks, O'Neill, Reilly, O'Brien & Courtney, PC, Philadelphia, PA, Edward W. Cochran, Shaker Heights, OH, Frank Tomlinson, Pritchard, McCall & Jones, Birmingham, AL, Paul Rothstein, Gainesville, FL, for John M. Guest, Brian G. Chapman, intervenor-plaintiff.

Cary L. Flitter, Lundy, Flitter & Beldecos, P.C., Narberth, PA, Benjamin E. Baker, Jr., John Perry Willis, IL, Hogan Smith & Alspaugh, Birmingham, AL, for Hogan, Smith & Alspaugh, P.C., intervenor-plaintiff.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

This shareholder class action raises a claim of securities fraud under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The plaintiffs have settled with defendant IKON Office Solutions, Inc. (IKON) and the individual defendants named in the complaint.[1] *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000). The parties have further stipulated to the dismissal of certain allegations against the remaining defendant, IKON's accounting firm, Ernst & Young LLP (E & Y or Ernst). *See* Order of October 27, 2000. The only remaining claim is the allegation of fraud pertaining to Ernst's unqualified audit opinion on IKON's consolidated, year-end financial statements for fiscal year 1997. These financial statements allegedly overstated pretax income by $54.9 million.

Now before the court is defendant E & Y's motion for summary judgment on the grounds that plaintiffs cannot establish two elements necessary to a Section 10(b) claim: that the accounting firm's actions caused a loss to the plaintiff class, and that the defendant accounting firm acted with the requisite state of mind. E & Y also seeks partial summary judgment on the grounds that liability cannot attach to E &

---

1. The complaint was twice amended. *See* Consolidated Class Action Compl. (filed August 14, 1998); Amended Cons.Cl. Act. Compl. (filed June 29, 1999 under seal); Second Amd. Cons.Cl. Act. Compl. (filed August 4, 1999 under seal).

Y with respect to a press release issued by IKON.

Summary judgment is granted on the grounds that no genuine issue of material fact has been raised as to either causation or scienter, and E & Y is entitled to judgment as a matter of law. Partial summary judgment with respect to the press release is also granted.

## I. Background[2]

IKON provides copiers, printing systems, and related services throughout the United States, Canada, and Europe. Its shares are publicly traded on the New York Stock Exchange. Between 1995 and 1998, IKON embarked on a "transformation" initiative in which it purchased close to 200 independent companies that it attempted, with some difficulty, to integrate into its own network.

Throughout IKON's fiscal year ending September 30, 1997 (FY97), E & Y performed certain internal audit functions for IKON. Ernst also served as independent auditor of IKON's FY97 consolidated year-end financial statements (the FY97 financial statements). On October 15, 1997, IKON issued a press release regarding its FY97 financial status. On December 24, 1997, Ernst publicly issued its unqualified,

or "clean," audit opinion stating that the FY97 financial statements fairly presented IKON's financial position in conformance with professional accounting standards.[3] The integrity of this audit opinion is at the heart of the dispute before this court.

The plaintiff class, as revised, encompasses those who acquired IKON's common stock, call options, and/or convertible preferred stock from October 15, 1997 through August 13, 1998, inclusive. *See Order of October 5, 2000.* From the start of the class period until April 22, 1998, IKON's stock price experienced a net gain. On April 22, 1998, when IKON announced its second quarter 1998 earnings and warned that its third and fourth quarter earnings would fall below expectations, the stock price dropped significantly. It experienced further net decline over the remainder of the spring and summer of 1998.

On May 31, 1998, IKON engaged E & Y to assist in a detailed review of all significant account balances on the books of certain IKON units, an undertaking known as the "Special Procedures." On August 14, 1998, after the conclusion of the Special Procedures, IKON announced a $110 million charge to earnings—$94 million in pre-tax charges applied to its 1998 third fiscal quarter earnings, and a restatement

---

**2.** This Part provides the general factual background for this case and is drawn primarily from the Joint Stipulation of Uncontested Facts, dated November 9, 2000 and filed with the court on the same day. The facts relevant to the specific issues of causation and scienter are set forth separately. *See infra* Parts III and IV.

**3.** The relevant portions of that unqualified audit opinion state:

We have audited the accompanying consolidated balance sheets of IKON Office Solutions, Inc .... and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the three years in the period ended September 30, 1997 ...
We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assur-

ance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of IKON Office Solutions, Inc., and subsidiaries at September 30, 1997 and 1996, and the consolidated results of their operations and their cash flows for each of the three years in the period ended September 30, 1997, in conformity with generally accepted accounting principles.
Second Amd. Compl. at ¶ 109.

of its previously reported and unaudited 1998 second quarter earnings to reflect $16 million in pre-tax charges. The $110 million in charges consisted of an increase in the lease default reserve of $28 million, an increase in the doubtful accounts receivable reserve of $20 million, adjustments due to the breakdown in internal controls at four operating units totaling $35 million, other adjustments of $7 million, and a loss due to asset impairment of $20 million. These charges were applied to fiscal year 1998 (FY98), not to the FY97 financial statements at issue in this case.

. In essence, plaintiffs' complaint is that the FY97 financial statements also overstated pretax income, and that E & Y knew or must have been aware of these overstatements when it issued its "clean" audit opinion with respect to those statements. Plaintiffs thus allege that E & Y violated Section 10(b) and Rule 10b–5 when it opined that IKON's FY97 financial statements conformed with Generally Accepted Accounting Principles (GAAP) and that E & Y's own audit of the FY97 financial statements complied with Generally Accepted Accounting Standards (GAAS).[4] Plaintiffs claim that two different documents give rise to E & Y's liability: the

December 24, 1997 unqualified audit opinion on the FY97 financial statements, and the October 15, 1997 IKON press release, which E & Y allegedly approved prior to its dissemination.

■ As noted previously, the defendant seeks summary judgment on two alternative grounds. First, the defendant claims that plaintiffs have offered no evidence that the shareholders suffered a loss due to the allegedly fraudulent misstatements, but rather, that the evidence shows that plaintiffs' loss was due to problems unrelated to the misstatements. The defendant also claims that there is no evidence that Ernst acted with scienter in conducting its FY97 audit and issuing its audit opinion. As discussed below, the court finds that plaintiffs have failed to make the requisite showing as to loss causation and, in the alternative, that plaintiffs have failed to make the requisite showing as to scienter. In addition, as noted in the margins, the court also finds, in the alternative, that the October 15, 1997 press release does not form a basis for a Section 10(b) claim, and thus grants defendant's request for partial summary as to the period from October 15, 1997 to December 24, 1997.[5]

**4.** GAAP is the "basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accounts ('AICPA'). These principles establish guidelines for measuring, recording, and classifying the transactions of a business entity." *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1222–23 n. 17 (S.D.N.Y.1992). Similarly, GAAS are the "standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination. Rule 202 of the Rules of Conduct of the Code of Professional Ethics of the AICPA requires members to comply with GAAP and GAAS when giving an opinion on financial statements." *Id.; see also Vosgerichian v. Commodore Int'l,* 862 F.Supp. 1371, 1372 n. 2 (E.D.Pa.1994) ("In essence, GAAS and GAAP delineate due professional care owed by accountants to their clients as stated by the accounting community.").

In addition, "GAAP consists of the official publications of the American Institute of Cer-

tified Public Accountants ('AICPA'). These official publications consist of Accounting Principles Board ('APB') opinions, Financial Accounting Standards Board ('FASB') Statements, and Accounting Research Bulletins ('ARB')." *In re Cirrus Logic Sec. Litig.,* 946 F.Supp. 1446, 1447 n. 7 (N.D.Cal.1996).

**5.** The IKON press release discussed fourth-quarter and year-end results and was issued on October 15, 1997, more than two months before the public filing of the audit opinion on December 24, 1997. *See* App. to Def. E & Y's Mot. for Summ. J. Tab (Def.Ex.) 75. It is not disputed that E & Y reviewed the press release before it was issued. The Supreme Court, however, has abolished Section 10(b) liability where a secondary actor merely aids and abets a 10(b) violation; rather, the Court stated, "the statute prohibits only the making of a material misstatement (or omission) or the commission of a deceptive act. The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Central Bank of Denver v. First*

## II. Legal Standards [6]

### A. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* FED. R.CIV.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter; rather, it determines whether or not there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *Id.* at 255, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 639 (3d Cir. 1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *See Anderson,* 477 U.S. at 248, 250, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. Section 10(b)

Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in

---

*Interstate Bank of Denver,* 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citations omitted). The Second Circuit affirmed summary judgment in a case with facts very similar to those in this case. *Wright v. Ernst & Young,* 152 F.3d 169, 175 (2d Cir.1998) (affirming summary judgment where accounting firm allegedly signed off on a press release, but press release did not attribute assurances to the firm or otherwise mention it, and thus the firm "neither directly nor indirectly communicated misrepresentations to investors"). As in *Wright,* the accounting firm in this case approved the press release, but the press release did not mention the defendant accounting firm, nor did it refer to an audit. *Id.* at 172, 175; cf. *In re Software Toolworks,* 50 F.3d 615, 628–29 and n. 3 (9th Cir.1994) (finding that *Central Bank* did not preclude liability where letter to the SEC named accounting firm and directed SEC to contact accountants for further information). As plaintiffs point out, some jurisdictions apply a "substantial participation" test with respect to secondary actors. See e.g., *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 433 (N.D.Ill 1995); *In re ZZZZ Best Sec. Litig.,* 864 F.Supp. 960, 970 (C.D.Cal. 1994). However, in *Wright,* the court stated than even under this substantial participation standard, which it declined to adopt, the court would be "hard pressed" to impose liability on the accountants. *Wright,* 152 F.3d at 176. Other courts in this district have come to similar conclusions. See *Vosgerichian,* 862 F.Supp. at 1377–78 (finding that allegations that accounting firm "consulted" with company, "advised or concurred" on certain decisions, and "provided direct and substantial assistance(3)27 in misrepresenting" certain transactions constituted an allegation of aiding and abetting that was not viable under *Central Bank*); *Copland v. Grumet,* 88 F.Supp.2d 326, 332 (D.N.J. 1999) (adopting *Wright* and dismissing 10b–5 claim against auditors, where their role in "formulating, preparing and/or compiling" false financial data did "not amount to actually making a false misrepresentation which can be attributed to them"). Thus, the court grants partial summary judgment as to the period from October 15, 1997 to December 24, 1997.

**6.** The specific legal standards for establishing proximate cause and scienter under a Section 10(b) claim are discussed separately. *See infra* Parts III and IV.A.

light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b–5(b). The elements of a Section 10(b) claim are that the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir.2000) (citations omitted).

### III. Causation

To prove loss causation in the Third Circuit, a plaintiff MUST show both: 1) that he or she "purchased a security at market price that was artificially inflated due to a fraudulent misrepresentation," *Semerenko*, 223 F.3d at 184 (citation omitted); and 2) "that the artificial inflation was actually 'lost' due to the alleged fraud," *id.* at 185, that is, that the stock price "dropped in response to disclosure of the alleged misrepresentations." *Id.* at 186. Whether the plaintiffs purchased securities at a price inflated by the alleged misrepresentations is not at issue. The defendant strenuously argues, however, that the stock price never "dropped in response to disclosure of the alleged misrepresentations." The court agrees.

As a preliminary matter, the defendant argues that loss should be measured on the day that IKON announced the results of the Special Procedures. On that day, August 14, 1998, IKON announced that it was taking $110 million in charges to the FY98 financial statements. Defendant's argument for measuring loss on that day is based on plaintiffs' implicit claim that even though the Special Procedures did not formally apply charges to or require restatement of the FY97 financial statements, they essentially disclosed the existence of the alleged FY97 misstatements.[7] It is undisputed that on the day that IKON announced the results of the Special Procedures, IKON stock did not decline; therefore, the defendant argues, no loss occurred. However, plaintiffs counter that the disclosure was not made via a single surprise announcement by IKON on August 14, but that the relevant disclosure effectively occurred during three specific "windows" of time in April, June, and July of 1998 when stock price did decline. *See* Def. Ex. 1 (pls.' expert, Professor Gregg Jarrell, Rpt.) at ¶¶ 39–61.

The court agrees with plaintiffs that, in theory, the relevant disclosure or disclosures could have been made through channels other than the company's public announcement on August 14, 1998, and that loss could be measured by the market's reaction to those disclosures. However, it remains plaintiffs' burden under *Semerenko* to provide evidence supporting a reasonable inference that such disclosures were in fact made, and that they were a proximate cause of loss. *Semerenko*, 223 F.3d at 184–87 (plaintiffs must show that the stock price "dropped in response to disclosure of the alleged misrepresentations," because "[w]here the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation"). Plaintiffs have not met this burden.

Turning to the substantive issue of causation, the persuasive authority is *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441

---

7. Plaintiffs do not explicitly argue that the Special Procedures disclosed the alleged FY97 misstatements; rather, plaintiffs argue that the Procedures deliberately covered up the misstatements. However, plaintiffs' argument can reasonably be read to imply that the Procedures indirectly revealed some or all the misstatements. Plaintiffs claim that the Special Procedures properly identified the FY97 overstatements, but then improperly "covered up" these overstatements either by offsetting them with false understatements, or by misallocating them in whole or in part to FY98 instead of to FY97. Thus, according to the defendant, the clear inference to be drawn from plaintiffs' position regarding the Special Procedures is that the Special Procedures disclosed the alleged FY97 misstatements.

(11th Cir.1997), which the Third Circuit found to be instructive on loss causation in *Semerenko*, 223 F.3d at 185. In *Robbins*, as in the case at bar, shareholders brought a Section 10(b) action against an accounting firm that issued a clean audit opinion for a company whose stock price subsequently declined. The accounting firm in *Robbins* approved the real estate company's 1988, 1989, and 1990 cash flow statements despite allegedly knowing that a variety of improper capitalization procedures had caused cash flow to be overstated. *See Robbins*, 116 F.3d at 1444. This overstatement in cash flow supposedly enabled the company to continue its practice of paying very high dividends, until analysts downgraded its credit rating due to their publicly-stated concerns about the company's increasing debt, declining equity base, and the deteriorating real estate market. *See id.* at 1445. Concerned about tighter financing and declines in its stock price, the company announced a drastic dividend cut in October 1990, and the stock price dropped even further on the day the dividend cut was announced. *See id.* It was not disclosed until some point in 1992 that it was discovered that the company had engaged in the accounting fraud that caused the overstatement of cash flow. *See id.*

In *Robbins*, the plaintiffs' damages expert measured loss by the drop in stock price that occurred on the day of the dividend cut. *See id.* The expert reasoned that the dividend cut exposed the company's true financial status, which was the same grim reality that would have been disclosed had the cash flow figures been correctly reported in the first place. *See id.* Thus, the expert assumed that the loss caused by the alleged fraud was the same as or equal to the loss associated with the dividend cut. However, the *Robbins* plaintiffs did not claim that the dividend cut actually resulted from, or was in any way

related to, the discovery of misstatements in the cash flow or other financial reports. *See id.* at 1445–46. Because the jury did not receive any evidence that the loss was caused by the defendant's alleged fraud, the Eleventh Circuit reversed the district court and granted judgment as a matter of law. *See id.* at 1448. As the plaintiffs' loss was not caused by the accounting fraud, the court concluded, whatever inflation the fraud might have caused was still incorporated into the stock value and had not been "lost" by the plaintiffs. *See id.*

As previously noted, plaintiffs' principle expert on causation, Professor Gregg Jarrell, identified three windows of loss as occurring on April 22, June 26 through 30, and July 27 through August 17, with each window triggered by a public announcement by IKON. *See* Def. Ex. 1 (Jarrell Rpt.) at ¶ 39–61. Professor Jarrell's report stated that "the information disclosed to the market [during these windows] caused the traded price of IKON to decline in a statistically significant manner and that the information revealed to the market included specific problems that Plaintiffs allege should have been disclosed by IKON at the beginning of the Class Period [October 15, 1997]." *Id.* at ¶ 63.[8] Thus, unlike in *Robbins*, where the plaintiffs made no claim and presented no evidence that the decline associated with the dividend cut announcement was related to the accounting misstatements, plaintiffs' expert in this case asserts that a link exists between the loss and the alleged misstatements. However, these conclusions are not supported by any evidence, but rather, the analysts' reports and the expert testimony show that the plaintiffs' loss was caused by problems unrelated to the misstatements. *See Brooke Group Ltd. v. Brown and Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (summary judg-

---

**8.** Professor Jarrell reiterated this principle in his deposition: "Q: Are you saying ... that the disclosures that occurred in April, June, and August revealed to the market the information that you are assuming had been wrongfully withheld as of the start of the class period? A: Yes, corrected it." Def. Ex. 8 (Jarrell Dep.) at 31.

ment appropriate where an expert opinion is not supported by sufficient facts, or where indisputable facts on the record contradict opinion or otherwise render it unreasonable) (citation omitted); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989) (summary judgment is generally not appropriate where nonmovant is supported by an expert, but is permissible if the evidence is clear and contrary to the opinion of such expert) (citation omitted).

Neither analysts' reports nor plaintiffs' expert analysis indicate that the stock decline was caused by anything other than business conditions and operational and management problems. IKON's announcement of its FY98 second quarter earnings shortfall, which set off the first "window" of decline on April 22, 1998, blamed "issues related to the transformation [i.e., IKON's aggressive merger and acquisition· initiative], competitive pressures, and costs associated with product rationalization," as described by Professor Jarrell. Def. Ex. 1 at ¶ 42. Jarrell testified that the market

> learned in the April announcement that the company was having problems with, among other things, managing and getting the synergistic benefits and integrating these many, many companies that they had been acquiring ... [O]ne of the things the April announcement did with respect to these mergers was to cause the market to be very concerned that this problem was not gone and that it was causing the company to be unhealthy and it could get worse.

Def. Ex. 8 (Jarrell Dep.) at 37–38. During the second window of decline, which was triggered by an announcement of lower-than-expected third quarter earnings on June 26, 1998, an analyst report cited by Professor Jarrell blamed "the same factors that led to the 2Q earnings shortfall, namely weak equipment sales amid tough competition from bigger industry rivals ... and problems associated with integrating and absorbing recent acquisitions."

Def. Ex. 1 at ¶ 48. The third window of loss began on July 27, 1998 with an announcement that IKON was investigating the causes of the FY98 earnings shortfalls and its operating problems. *See id.* at ¶ 52. Overall, in contemplating the analysts' reports, Jarrell summarized that with respect to most analysts' reports, "the problem is the consolidation. The problem is the mergers." Def. Ex. 8 at 85. Thus, as .described by plaintiffs' expert, IKON's announcements and analysts' reports focused on factors such as the transformation initiative, tough competition, and weak sales, and not on the alleged accounting misstatements or income inflation.

Plaintiffs also contend, however, that they need not point to any *direct* reference to the financial misstatements or inflated income, because the fact that income had been inflated was disclosed *indirectly* through the disclosures of business troubles and earnings shortfalls. The argument is, in essence, that the inflated income report led to unrealistically high earnings projections, and that these earning projections were subsequently exposed as too high when the market recognized the true state of IKON's business and operating conditions in the spring of 1998, resulting in the loss. For example, when asked whether the price declines triggered by the April and June announcements were "related in any way to the matters that were allegedly wrongfully withheld at year end 1997," plaintiffs' damage expert, Professor R. Alan Miller, responded, "[B]oth price declines were caused by lower earnings than had been expected, and that's the issue that was involved in the fiscal 1997 financials." Def. Ex. 9 (Miller Dep.) at 210; *see also* Def. Ex. 1 at ¶ 69 (Jarrell's report stating that the announcements of earnings shortfalls "alerted the market that IKON's expected growth in earnings was too optimistic ... [H]ad IKON made a hypothetical corrective disclosure [in the FY97 financial statements] that its 1997 earnings would be significantly below expectations, the market would

have at that time revised downward its earning growth expectations."). Thus, plaintiffs argue that the announcements of earnings shortfalls and other operational and business problems exposed the grim reality of the company's situation, and corrected the undue optimism caused by the FY97 income inflation. *See* Def. Ex. 1 at ¶ 39 (the three windows of decline, according to Professor Jarrell, were caused by "material disclosures . . . [that] revealed IKON's true financial condition to investors"). In this respect, however, the plaintiffs' theory is the same as that in *Robbins*, where the plaintiffs claimed that the loss associated with the dividend cut exposed the true value of the stock and thus corrected the inflation caused by the fraud, even though there was no evidence that the market recognized any relationship between the dividend cut and the fraud.[9] *See Robbins*, 116 F.3d at 1448. In this case, as in *Robbins*, it is not sufficient to show inflation caused by a misrepresentation and subsequent loss; the determina-

tive factor is that there is no evidence that the alleged misstatements loss caused the loss, as opposed to or in addition to other factors.[10]

The evidence that comes closest to showing that the market was aware of potential problems with the financial statements is Professor Jarrell's finding that the market anticipated the need to take charges prior to IKON's August 14 announcement.[11] *See* Def. Ex. 8 at 64–97. The anticipation of charges to previous accounting statements is an indication that the market recognized the possibility of accounting problems, rather than or in addition to other problems. *See generally* Pls.' App. of Ex. to Mem. in Opp'n to E & Y's Mot. for Summ. J. Tab (Pls.Ex.) 58 (APB Opinion No. 20) (discussing the reporting of changes or errors to accounting statements). Professor Jarrell explained that bad news about earnings and operations such as that announced by IKON often precedes charges[12], and pointed to

9. Other expert testimony also seems to point to a theory similar to that rejected in *Robbins*, where damages are assumed when the stock price falls even where the decline is not traced to the alleged fraud, simply because the decline supposedly removes some of the artificial inflation. For example, Professor Miller testified that "there was no mention in the April or June disclosures of the '97 omissions or the understatement by 54.9 million of the operating expenses in fiscal year 1997. So they were not curative with respect to the fraud. From a damage perspective with respect to reducing the stock price at that point and, therefore, causing less inflation afterwards, they could be viewed as curative if one . . . chose to use that word for that purpose." Def. Ex. 9 at 208–09.

10. Plaintiffs stress the Third Circuit's "practical approach" to loss causation, which applies "general causation" or "proximate cause" principles rather than a strict test of direct causation. *EP Medsystems, Inc. v. Echo-Cath, Inc.*, 235 F.3d 865, 883–885 (3d Cir. 2000) (discussing "practical" approach generally). This argument does not prevent summary judgment or assist in distinguishing the case at bar form *Robbins*, however, since *Robbins* also employed a proximate cause standard. *Robbins*, 116 F.3d at 1447; see also *EP Medsystems*, 235 F.3d at 884 (citing Robbins in support of the "practical" approach). *EP*

*Medsystems* confirms that the Third Circuit;s practical approach still requires "sufficient casual nexus between the loss and the alleged misrepresentation," *id.* at 883 (citation omitted), and "limits the ability of plaintiffs to recover for losses sustained on the basis of factors unrelated to any misrepresentation of fraud." *Id.* at 884 (citation omitted). As discussed, the evidence in this case simply does not show that between the losses complained of were a cause, either direct or indirect, of the alleged misstatement.

11. As support for the theory that IKON's stock price suffered "anticipatory" declines, Professor Jarrell explained that IKON had a history of transformation troubles and earnings shortfall that had previously caused anticipatory declines in the spring of 1997, and that the existence of similar transformation problems in the spring of 1998 caused the market again to react negatively prior to the formal disclosure of charges. *See* Def. Ex. 8 at 220–27.

12. *See* Def. Ex. 8 at 75 ("It began in April . . . and [IKON] gives another earnings warning in June . . . and when management's credibility gets to an all-time low and by the time you change presidents and then by the time you tell the market that you're instituting a full

certain reports that explicitly or implicitly support the idea that the market anticipated charges during the spring and summer of 1998. For example, Jarrell highlighted an analyst's report of July 9, 1998 that stated that the company

> announced this morning ... that the reporting of the fiscal third quarter results would be delayed in order for IKON to dig into the current numbers before reporting to shareholders what the outcome is likely to be. We would not be surprised to see some charges and reserves taken in fiscal quarter three as well.

Def. Ex. 8 at 92; *see also id.* at 80 (explaining that in analyst report of May 27, 1998, "Smith Barney is talking about could more cost cutting be in the cards[.] And a major way that you do that is with taking charges and writeoffs"); *id.* at 89 (citing a July 6, 1998 report that discusses IKON's balance sheet, and interpreting the analyst's wish that IKON "get its house in order" as a euphemism for the expectation that charges would be taken). However, none of the reports cited for this proposition were issued within any of the identified windows of loss, nor does it appear that the announcements coincided with any loss at all, which undermines the notion that the anticipation of charges caused any of the loss of which plaintiffs complain.

Finally, plaintiffs seek to explain the lack of explicit connection between the stock price declines and the FY97 financial statements by asserting that the announcements blaming the company's troubled state on business conditions and transformation problems deliberately obscured the real problem—the fraudulent FY97 income inflation. Whether or not this is true, the assertion of a cover-up does not appear to help plaintiffs establish loss causation. If the FY97 misstatements were successfully covered up, they were never disclosed to the market and there-

fore could not have caused a loss. Alternatively, if the cover-up did not succeed, and the market became aware at some time that the accounting statements were incorrect, then proof of the market's awareness and proof of loss caused by such awareness is still required.

As discussed, the evidence presented does not support a reasonable inference that the disclosure of the alleged misstatements caused plaintiffs' loss.

## IV. Scienter

### A. Standards

■ Plaintiffs must also be able to prove that the defendant acted with scienter, that is, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Third Circuit has held that a showing of "recklessness" satisfies the scienter requirement, but only where the reckless acts constitute

> highly unreasonable conduct, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979) (citing and adopting standard set forth in *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)) (punctuation omitted). The Third Circuit has further explained that

> an opinion must not be made with reckless disregard for its truth or falsity, or with a lack of genuine belief that the information disclosed was accurate and complete in all material respects. Therefore, an opinion that has been issued without a genuine belief or reasonable basis is an untrue statement which,

---

review and delaying your earnings report, now it's a foregone conclusion and the question is how big will the charges be."); *id.* at

64–65 (stating that under the circumstances, "it would have been very, very normal for analysts to expect charges").

if made knowingly or recklessly, is culpable conduct actionable under § 10(b) and Rule 10b–5.

*Kline v. First Western Gov't Sec.,* 24 F.3d 480, 486 (3d Cir.1994) (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.1985) (punctuation omitted)). The Third Circuit therefore requires a very strong form of recklessness, one that is "relatively close to intentional conduct." *Healey v. Catalyst Recovery of Penn.,* 616 F.2d 641, 649 (3d Cir.1980) (rejecting jury instructions defining a reckless act under 10b–5 as one done with "indifference to the consequences").

However, the Third Circuit has also stressed that

> to prove scienter the plaintiff need not produce direct evidence of the defendant's state of mind. Circumstantial evidence may often be the principal, if not the only, means of proving bad faith. A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it have traditionally supported a finding of liability.... In such cases, the factfinder may justifiably conclude that despite [repeated] assertions [of good faith,] the danger of misleading ... was so obvious that the actor must have been aware of it.

*McLean,* 599 F.2d at 1198 (citations, punctuation omitted); *see also Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (noting that circumstantial evidence can be "more than sufficient" to prove scienter in fraud cases).

■ It is important to note that "negligence[,] whether gross, grave or inexcusable, cannot serve as a substitute for scienter." *McLean,* 599 F.2d at 1198. For example, mistakes in accounting calculations, unreasonable accounting procedures, or even outright violations of professional standards, without more, simply do not establish scienter. *See In re Worlds of Wonder,* 35 F.3d 1407, 1426 (9th Cir.1994) ("The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."); *In re Bell Atlantic Corp. Sec. Litig.,* No. 91–0514, 1997 WL 205709, at *30 (E.D.Pa. Apr.17, 1997) (same), *aff'd per curiam,* 142 F.3d 427 (3d Cir.1998); *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 163 (S.D.N.Y. 1990) ("[T]o establish scienter through recklessness, it is not enough for plaintiff to establish that the method of preparation for the projections used simply was unreasonable."); *Quest Med., Inc. v. Kirschner Med. Corp.,* No. WN 90–858, 1992 WL 311193, at *3–4 (D.Md. Jul.29, 1992) ("If an accounting firm could be charged with fraud every time that its audit did not conform to [GAAP], then every claim of malpractice would also constitute a claim of fraud.") (citation omitted).

Generally, scienter is a fact-specific issue which should ordinarily be left to the trier of fact. *See In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir. 1989) (citations omitted). However, summary judgment may be granted in appropriate cases. *Id.* For example, summary judgment has been granted where the evidence presented permits only an inference of negligence, not of scienter. *See, e.g., In re Goodyear Tire & Rubber Co.,* No. 88–8633, 1993 WL 130381, at *17 (E.D.Pa. Apr.22, 1993) (granting summary judgment, in part for failure to prove recklessness rather than negligence); *In re Bell Atlantic Corp.,* 1997 WL 205709, at *30 (same). Summary judgment has also been granted where an inference of scienter is raised but is rebutted by other evidence. *See, e.g., In re Software Toolworks,* 50 F.3d 615 (9th Cir.1994) (affirming summary judgment where a factual issue existed as to whether prospectus properly reflected revenues, but no issue existed as to scienter of accounting firm that helped prepare the prospectus because the firm actively worked to confirm such revenues); *In re Worlds of Wonder,* 35 F.3d at 1421–

22 (affirming summary judgment as to corporate officers accused of fraudulent expansion scheme, where inference of scienter was rebutted by officers' overall pattern of conduct).

### B. Overview of Evidence Presented With Respect To Scienter

In this case, plaintiffs claim that the FY97 financial statements included numerous fraudulent misstatements, causing income to be inflated by $54.9 million. Plaintiffs provide several types of evidence to prove that when Ernst issued its clean audit opinion, it approved those alleged misrepresentations with scienter.

■ To raise an inference of scienter as to the 1997 audit as a whole, plaintiffs try three different approaches. First, plaintiffs describe "red flags" that should have alerted Ernst that IKON might be concocting fraudulent numbers. Plaintiffs claim that Ernst failed to investigate these red flags, indicating that Ernst acted with either knowing or reckless disregard for the truth when it opined on the FY97 financial statements. However, the court does not find that the evidence reasonably supports an inference that Ernst failed to properly investigate the allegations of fraud. Second, plaintiffs provide evidence that Ernst knew that IKON's internal accounting structure was in utter disarray, and claim that such knowledge supports the allegation that Ernst acted recklessly in approving the FY97 financial state-

ments. The court finds that a reasonable jury could not infer that recklessness based on the fact that Ernst knew of problems with IKON's internal accounting structure. Third, plaintiffs claim that the Special Procedures, which applied charges to the FY98 financial statements but not to the FY97 financial statements, consisted merely of sham procedures and were performed with the express purpose of obscuring the alleged FY97 misstatements. The court further finds that the evidence presented rebuts any inference that the Special Procedures were such a sham.

Plaintiffs also offer evidence as to each individual alleged misrepresentation.[13] A significant portion of the $54.9 million in alleged misstatements, plaintiffs claim, can be proven to be fraudulent because calculations failed to accord with IKON's internal accounting policies. Plaintiffs claim that IKON's internal policies equaled the standards set forth by GAAP, and that therefore, when Ernst approved calculations that deviated from those internal policies, its approval was either in knowing or reckless violation of professional standards. The court disagrees, finding that the evidence presented does not reasonably support the theory that calculations that violated internal policy also violated GAAP, and thus does not reasonably support the theory that Ernst acted with scienter when it approve such calculations.

Plaintiffs also claim that scienter can be proven through evidence that certain cal-

**13.** Plaintiffs allege the following "known" misstatements, *see* Pls.' Mem. in Opp'n to E & Y's Mot. for Summ. J. at 8–21: in the Southern California District, a $4.2 million shortfall in the lease default reserve and a $2.8 million overstatement in inventory; and in the IKON Management Services unit (IMS), a shortfall in the doubtful accounts receivable reserve causing an income overstatement of $3.6 million and a failure to eliminate intercompany balances causing an overstatement of $4.1 million. Plaintiffs also claim that the Summary of Audit Differences (SAD), which is the list of differences between the company's numbers and the audit's findings, wrongfully omitted certain known information. Specifically, $2.3 million was posted to the SAD, an

amount not a large enough to require the posting of an adjustment; however, plaintiffs claim that had the SAD included all relevant differences, an adjustment of $6.2 million would have been required.

Plaintiffs also allege the following "reckless" misstatements, *see id.* at 21–34: a $17.0 million misstatement with respect to the accounts receivable reserve, including a failure to create a $3.7 million reserve in the Southern District (Atlanta) and an $11.4 million shortfall in the Northern California District; a $10.4 million overstatement due to unsupported or unreconciled accounts; and a failure to eliminate $3.3 million in intercompany balances company-wide.

culations performed during the 1997 audit—for example, the calculation of the inventory reserve in the Southern California District—were performed, either knowingly or recklessly, in violation of professional standards. The court finds that although there are issues of fact as to whether certain discrete calculations in fact complied with GAAP, there is insufficient evidence to raise an inference of scienter with respect to the entirety of the 1997 audit and audit opinion.

### C. Ernst's Response to Allegations of Fraud

Plaintiffs claim that Ernst failed to properly investigate or otherwise respond to allegations of accounting fraud raised against IKON management during both the 1997 audit and the Special Procedures. Ernst's conduct during the 1998 Special Procedures is relevant to plaintiffs' claim that the Special Procedures covered up and continued the 1997 financial statements fraud.[14] *See generally Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that in establishing intentional discrimination in employment, proving a defendant's efforts to cover up the discriminatory purpose is "part of (and often considerably assists) the greater enterprise" of proving wrongful intent). Plaintiffs are correct that if Ernst merely forged ahead blindly in auditing the FY97 financial statements or while conducting the Special Procedures, despite knowing that its client might be supplying fraudulent numbers, such conduct could reasonably raise an inference that Ernst acted with either knowing or reckless disregard for the truth. *See Eisenberg,* 766 F.2d at 776 ("When the opinion or forecast is based on underlying materials which . . . under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may support an inference that when the defendant expressed the opinion it had no genuine be-

lief that it had the information on which it could predicate that opinion.") (citation, punctuation omitted); *SEC v. Infinity Group Co.*, 212 F.3d 180, 193 (3d Cir.2000) (affirming district court ruling that even if defendant was not aware of fraud because he did not investigate warning signs, "ignorance provides no defense to recklessness where a reasonable investigation would have revealed the truth to the defendant"). Furthermore, a failure to reasonably investigate known allegations of fraud seems especially relevant, albeit clearly not indispensable, to the task of distinguishing scienter from mere negligence. *See McLean,* 599 F.2d at 1198 (negligence, whether gross, grave or inexcusable, cannot serve as a substitute for scienter). In other words, since the publication of inaccurate accounting figures or the failure to follow GAAP, "without more," do not establish scienter, *Worlds of Wonder,* 35 F.3d at 1426, then plaintiffs could potentially show "more" by establishing the defendant's failure to investigate potentially unreliable information. *See generally DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("The story in this complaint is a familiar one. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiffs contends that the difference must be attributable to fraud. . . . [However, b]ecause only a fraction of financial deteriorations reflects fraud, . . . [i]nvestors must point to some fact suggesting that the difference is attributable to fraud."); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 538 (3d Cir.1999) (same, citing *DiLeo,* 901 F.2d at 627, and affirming district court's dismissal of complaint pled under Section 10(b)).

The evidence in this case indicates that Ernst did not fail to respond to the red flags it encountered, but that it received reasonable assurances that the top management at IKON was informed of all potential problems and that all allegations

---

**14.** For further explanation of plaintiffs' cover-up theory, see *infra* Part IV.E.

received due investigation by outside counsel. In the spring of 1997, George Berry, the E & Y partner responsible for the IKON account, was told that a top IKON officer had accused IKON CFO Kurt Dinkelacker of "cooking the books." *See* Pls. Ex. 54 (handwritten notes of Berry); Def. Ex. 15 (Berry Dep.) at 56–88. Dinkelacker told Berry that the remark was meant to suggest that Dinkelacker was hiding expenses, that the remark was politically motivated, and that Dinkelacker had told John Stuart, then the President and CEO of IKON, that the allegation was false. *See* Def. Ex. 15 at 61–62. IKON ordered an independent investigation conducted by two senior partners in the law firm of Ballard Spahr Andrews & Ingersoll, LLP, who subsequently reported to Berry that there was "nothing" to the allegation, *see id.* at 88, and that the alleged accuser, Peter Shoemaker, either denied making the comment or was misunderstood. *See id.* at 77–78; *see also* Def. Ex. 14 (Shoemaker Dep.) at 7–22. Berry testified that he was sufficiently reassured by the company's decision to engage counsel to investigate, by that counsel's oral assurances, by his knowledge that IKON's President and CEO was aware of the allegation, and by the fact that Ernst would eventually review the transformation expenses in question as part of the audit procedures. *See* Def. Ex. 15 at 83.

Another red flag was waved in the spring of 1998, when internal audit work at the Florida District suggested that intercompany transactions, which are required to be "eliminated" so that income is not inflated due to internal transactions that merely transfer profits and/or assets from one part of the company to another, were being hidden in other accounts. *See* Pls. Ex. 50 (internal audit report on Florida District dated June 2, 1998) and Pls. Ex. 8 (ARB 51) (setting forth professional standards on elimination of accounts). On July 2, 1998, the IKON board formally engaged Ernst to perform the Special Procedures. *See* Pls. Ex. 51 (engagement letter). The board also hired the law firm of Dechert Price & Rhoads to advise the outside directors as to the Special Procedures, and Dechert in turn hired Arthur Andersen, another accounting firm, to provide accounting expertise in connection with its investigation. *See* Def. Ex. 22 (M. McAleer, Andersen partner, Dep.) at 9 and Ex. 23 (T. Costello, Andersen partner, Dep.) at 7. Ernst was well aware of the fact that the board had engaged Andersen, since three top Ernst partners signed an agreement on July 2, 1998 that permitted Andersen to review all workpapers prepared in connection with the FY97 audit, the first and second limited FY98 quarterly reviews, and the Special Procedures. *See* Pls. Ex. 69. Although Berry testified that he did not know the precise nature of Andersen's engagement, he also testified that their general object was apparent. Def. Ex. 15 at 110 (Berry stating that "[b]y their conduct I would say they were hired to review our work in connection with the special procedures").

While Ernst was performing the Special Procedures, yet another serious allegation came to light. In July of 1998, several IKON employees "indicated that they are not comfortable with certain accounting directions which they had been receiving from IKON Corporate" and were being instructed to perform "unnatural acts." Pls. Ex. 52 (encompassing several memoranda, including memorandum dated July 16, 1998 from M. Dudek to J. Forese, executive vice-president and president of IKON's international operations, and Dinkelacker). Berry and other senior Ernst employees received written notice of these allegations; Berry further documented in writing his discussions with head IKON officers and the steps he took to identify the individuals making the allegations, *see id.*, and he then delivered these memoranda to the independent investigators at Dechert. *See* Def. Ex. 15 at 38, 93. Around the same time, Berry learned of two additional suspicious incidents in which Ernst inquired after certain IKON calculations, and IKON executives

reported that upper management had simply directed them to ignore the issues or deal with them in a certain way. *See id.* at 19–32. Berry encouraged the board to hire counsel to investigate these incidents, *see id.* at 19, 24–25, 91–92, spoke to the investigator at Dechert about them, *see id.* at 90–94, and testified that Ernst's own inquiry into one of the incidents ultimately revealed a satisfactory explanation of the calculation. *See id.* at 32. Berry was not the only Ernst manager who was aware of these red flags; another senior Ernst manager, Carmen Nepa, testified that in response to the investigations, Ernst expanded the scope of their 1998 procedures to ensure that the field auditors reviewed the areas of concern. *See* Pls. Ex. 6 at 24–28.

While these episodes[15] clearly raised concerns as to the conduct of IKON management with respect to its own accounting practices, a jury could not reasonably infer scienter on Ernst's part based on its reaction to these red flags. *Cf. In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 415–17 (S.D.N.Y.1998) (finding that managers of unethical stock trader engaged in "willful blindness" where they monitored trader's fantastically high profits, facilitated trader's fraud by modifying computer system and giving him advice, did not investigate other employees' suspicions, and did not respond to Federal Reserve's inquiries). While plaintiffs' expert on auditing procedures complains that Ernst should have alerted its field auditors to the allegations of fraud, and claims that Ernst should have instigated an investigation of its own in the summer of 1998, *see*

Def. Ex. 74 (Devor Dep.) at 472–84, the professional standard regarding auditor investigations states only that the auditor

> should, as soon as practicable, undertake to determine whether the information is reliable and whether the facts existed at the date of his report. In this connection, the auditor should discuss the matter with his client at whatever management levels he deems appropriate, including the board of directors, and request cooperation in whatever investigation may be necessary.

Pls. Ex. 53 (AU Section 561, issued by the AICPA and entitled "Subsequent Discovery of Facts Existing at the Date of the Auditor's Report") at ¶ .04. The plain language of the professional standard states that further investigation is required only if, among other things, the information is deemed reliable and would have changed the report previously made. *See id.* at ¶ .05. Although plaintiffs' expert testified that he felt that Ernst should have done more, Def. Ex. 74 at 481–83, he also agreed that under the professional standard, the precise means of investigation are left to the auditor's judgment. *See id.* at 481. In both 1997 and 1998, Ernst knew that the board was informed of the allegations and had hired independent investigators. It appears that Berry and other Ernst employees cooperated with the independent investigators in 1997 and 1998. Berry was assured by independent counsel that the 1997 allegations were groundless, and with respect to the 1998 allegations, Ernst partners knew that the board had hired counsel as well as outside

---

**15.** An additional red flag highlighted by plaintiffs is an E & Y checklist titled "Internal Control and Fraud Considerations," dated May 29, 1997 and prepared during the planning stage of the 1997 year-end audit. Pls. Ex. 55. This document indicates that Ernst felt IKON set "unduly aggressive earnings targets," had "excessive interest in maintaining or increasing [its] stock price or earnings trend," and committed analysts to "achieve what appear to be unduly aggressive or unrealistic forecasts." *Id.* The significance of this document appears to be minimally probative as to Ernst's state of mind, however, as these characteristics are only three of many dozens of risk factors on the checklist, and Ernst flagged only a handful of factors as a concern. *See id.* Plaintiffs also overstate the significance of memoranda issued by Dinkelacker that appear to urge the generation of false income, *see* Pls. Ex. 56, as Berry did not know of these documents until November 1998. *See* Def. Ex. 15 at 168–169.

accountants to review, among other things, the workpapers related to the FY97 audit, the FY98 quarterly statements, and the Special Procedures; furthermore, the results of the Special Procedures were ultimately discussed with and approved by the outside accountant. *See* Def. Ex. 22 at 155–56, 167–68, 182–83; Def. Ex. 23 at 219–223. Under these circumstances, Ernst's responses to the allegations of fraud do not reasonably permit an inference that Ernst engaged in "highly unreasonable conduct, involving . . . an extreme departure from the standards of ordinary care." *McLean,* 599 F.2d at 1197.

### D. Evidence that Ernst Knew that IKON's Internal Controls Were Faulty

■ As further evidence that E & Y acted recklessly with respect to the FY97 audit as a whole, plaintiffs offer proof that Ernst knew that IKON's internal accounting system was in utter disarray. However, plaintiffs offer no evidence as to why Ernst's knowledge of the failure of IKON's internal accounting system is relevant to Ernst's independent audit or to its audit opinion. Rather than supporting an inference of scienter, the evidence presented indicates that Ernst not only gave due consideration to areas where internal controls had failed, but also planned its audit with the express purpose of avoiding reliance on the faulty internal control systems.

Prior to serving as IKON's independent auditor for the year-end financial statements, E & Y also performed many of IKON's internal audit functions for FY97, which required it to evaluate whether IKON's own accounting policies were being followed. Ernst discovered high rates of noncompliance with internal auditing policies throughout the company, and its findings were reported to top IKON management by IKON CFO Dinkelacker both at midyear and year-end. *See* Pls. Exs. 23 and 48. These findings were also followed up with detailed letter reports by Ernst that analyzed each internal control problem and made recommendations for its improvement, which were sent at year-end to key IKON officers, the board, and the presidents of the districts at which Ernst performed audit procedures. *See* Pls. Ex. 38. A plain reading of these letters reflects a detailed review of problem areas, aimed at ferreting out unreliable procedures and preventing their recurrence. Each letter's introductory paragraph states that "[Ernst] considered [IKON's] internal control structure *to determine [Ernst's] auditing procedures* for the purpose of expressing [its] opinion on the consolidated financial statements. . . . The following suggestions, which resulted from [Ernst's] consideration of the internal control structure, are submitted *to assist in improving procedures and controls." Id.* (emphasis added). The lists of deficiencies and suggested reforms contained in these letters clearly had a forward-looking purpose, and nothing suggests that Ernst relied on the deficient internal controls in conducting the 1997 audit. To the contrary, in some cases, Ernst explained how it resolved the problem, even if on a temporary basis. *See id.* (noting that in the Central District, accounts payable reconciliations were not prepared each month as required, but that "[d]uring June, all open items were resolved, and the accounts payable balance was properly reconciled to the general ledger"). Such efforts do not indicate a knowing or reckless acceptance of or reliance on faulty internal controls, but rather, indicate an effort to identify and reconcile them.

Furthermore, there is evidence that Ernst designed its audit procedures with the express purpose of avoiding reliance on failed internal controls. One of the steps in planning the scope of the year-end audit involved analyzing IKON's internal controls, including the internal audit findings that were complete as of April 1997. *See* Decl. of J. Mulherin (E & Y's engagement partner for the year-end audit) at ¶¶ 8–11 (attached to Def.'s Mot. for Summ. J.). Ernst then established an "effective/not rely" approach for the year-end

audit, which set forth the general principle that IKON's internal controls would be considered "effective" since they were "designed and placed in operation," but that in conducting the 1997 audit, E & Y "would not rely on the testing of controls as the primary support for an audit opinion. Rather, [Ernst] would perform substantive testing—such as analytical procedures and tests of details—to serve as [its] principal source of audit evidence." Mulherin Decl. at ¶ 17; *see also* Pls. Ex. 19 (Ernst's "Generalized Audit Program Steps" for 1997 audit) (stating that the program "assumed that substantive testing without placing reliance on the related systems is the most efficient way to audit," and permitting each district to determine whether addition substantive testing was necessary). *See generally* Pls. Ex. 74 (AU 322, issued by the AICPA) (approving approach where auditors do not consider internal controls after completion of initial analysis). While it is far from clear how these generalized audit principles translated into practice or the extent Ernst to which actually avoided relying on internal controls, especially in light of the fact that Ernst employed a "roll forward method" for the fourth quarter that contemplated partial reliance on internal controls, *see* Mulherin Decl. ¶ 18 and Def. Ex. 73 at 302, plaintiffs cannot rest on their allegations but must come forth with evidence establishing a genuine issue of material fact. Far from supporting plaintiffs' claim that Ernst must have acted recklessly simply because it knew that IKON's internal controls were deficient, however, the evidence here indicates that Ernst used that knowledge to try to ferret out and improve the faulty controls, and made obvious attempts to avoid undue reliance on them.

### E. Evidence that Special Procedures Were a Cover-up

As circumstantial evidence that the FY97 audit, as a whole, was fraudulently conducted, plaintiffs also offer evidence that the Special Procedures were a cover-up for that fraud. The court has already considered plaintiffs' claim that E & Y failed to properly investigate the allegations of fraud that came to light during the Special Procedures. Plaintiffs also contend that the actual accounting work performed during the Special Procedures so egregiously violated professional standards that Ernst knew, or must have been aware, that the Special Procedures were merely a sham exercise.[16] The court finds that there is insufficient evidence to support this theory, because the conduct of Arthur Andersen sufficiently rebuts any inference of scienter that might be raised by the commission of GAAP violations.

It is clear that Andersen did *not* review the 1997 opinion or financial statements for compliance with GAAP or GAAS, *see* Def. Ex. 22 at 15–17, 147 and Def. Ex. 23 at 37–39, nor did it assess the overall quality of the audit. *See* Def. Ex. 22 at 28. However, Andersen was hired as the board's accounting expert in connection with its investigation of the Special Procedures, and in this capacity had a clear duty to notify the board if it disagreed with the allocation of adjustments proposed by Ernst. *See* Def. Ex. 22 at 155–56; Def. Ex. 23 at 223. While Andersen did not review the allocations "line by line," Def. Ex. 22 at 67, it did sign off on the final allocation of charges at the conclusion of the Special Procedures, and concurred with the decision not to restate the FY97 financial statements. *See id.* at 155–56, 167–68, 182–83; Def. Ex. 23 at 219–223. For a jury to credit plaintiff's claim that

---

**16.** In general terms, these alleged violations consist of the fabrication of an offset of $.65 million in unsupported overaccruals and reversals of waived adjustments identified on the 1997 Summary of Audit Differences; the invention of an $18 million adjustment to reduce IKON's inventory reserve, allegedly in contradiction to Ernst's field personnel findings and in violation of the professional standard on the reporting of a change in estimate; and the misallocation of charges to FY98 instead of to FY97. *See* Pls.' Mem. in Opp'n at 39–45.

the Special Procedures were a cover-up, however, the jury must receive evidence discrediting the fact that Andersen approved the outcome of the Special Procedures. For example, the jury would require evidence as to how the allegedly blatant cover-up escaped the notice of the investigators, or evidence suggesting that Andersen was somehow involved in the cover-up. No such evidence is presented, and therefore the court is satisfied that Ernst's conduct during the Special Procedures was not such an extreme departure from the standards of ordinary care that it could constitute evidence of scienter. *See In re Worlds of Wonder*, 35 F.3d at 1426 (in establishing scienter, "[t]he plaintiff must prove that ... the accounting judgment which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts") (citations, punctuation omitted).

### F. Evidence that Calculations that Violated IKON's Internal Policy Also Violated GAAP

The court now turns to the evidence presented as to each allegedly fraudulent misstatement. Plaintiffs claim that many of the alleged misrepresentations—indeed, the bulk of the $54.9 million in total alleged misrepresentations—were violations of GAAP because they were not calculated in accordance with IKON's internal accounting policies. Specifically, plaintiffs place in this category a $4.2 million shortfall in the lease default reserve in the Southern California District, a $17.0 million reckless misstatement with respect to

the accounts receivable reserve, a $3.6 million known misstatement with respect to the accounts receivable reserve in the IKON Management Services unit (IMS), and a $10.4 million overstatement due to unsupported or unreconciled accounts.[17] Plaintiffs argue that IKON's internal accounting practices were substantially equivalent to GAAP, and that therefore, because these specific calculations deviated from the internal policy, they also deviated from GAAP.

The showing that internal policy equaled GAAP is critical to this claim, because "there can be no claim of fraud based merely on a company's deviation from its own undisclosed internal accounting policies." *In re Cirrus Logic Sec. Litig.*, 946 F.Supp. 1446, 1458 (N.D.Cal.1996) (citations omitted); *see also In re Worlds of Wonder*, 147 F.R.D. 214, 217 (N.D.Cal. 1992) ("It is unfair to use professionals' self imposed standards, which may exceed industry standards, against them to try to prove fraud. This violates public policy, which encourages the highest standards, in order to protect the public."). "Where, however, a company deviates from its own procedures in a way that violates GAAP, that deviation from internal policy may be evidence of scienter." *In re Cirrus Logic*, 946 F.Supp. at 1458 n. 10 (citations omitted).

The court now addresses the evidence presented to show that internal policy equaled GAAP in the areas of accounts receivable reserves and lease default reserves.[18]

---

**17.** Other alleged misrepresentations may also rely on the theory that internal policy equaled GAAP. In cases where the allegation was not clearly based solely or primarily on this theory, the court addresses the allegation separately.

**18.** As noted, plaintiffs claim fraudulent misstatements based on deviations from IKON's internal policy in: 1) accounts receivable allowances ($20.6 million total); 2) lease default reserves ($4.2 million); and 3) unsupported or unreconciled accounts ($10.4

million). Thus, plaintiffs must be able to sufficiently establish that in each of these three areas, the internal policy equaled GAAP. Plaintiffs cite to expert testimony with respect to the doubtful accounts receivable reserves, *see* Pls.' Mem. in Opp'n at 21–22 n .8, which is addressed by the court subsequently in the body of this opinion. The court also addresses expert testimony with respect to whether the internal policy on lease default reserves equaled GAAP. However, since plaintiffs do not cite to any expert evidence as to the unsupport-

### 1. Accounts Receivable Reserves

■ With respect to the doubtful accounts receivable reserves, plaintiffs offer a report jointly authored by Professors Douglas Carmichael and Harris Devor, as well as testimony from both experts, to show that internal IKON accounting policies were substantially equivalent to GAAP. However, the expert opinions do not provide sufficient facts in support of their conclusions. *See Brooke Group*, 509 U.S. at 242, 113 S.Ct. 2578 (expert opinion lacking factual basis may not defeat a motion for summary judgment); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1198–99 (3d Cir.1995) (same); *Fireman's Insur. Co. v. DuFresne*, 676 F.2d 965, 969 and n. 4 (3d Cir.1982) (party resisting summary judgment may not rely merely on bare assertions, conclusory allegations or suspicions); *Peerless Heater Co. v. Mestek, Inc.*, No. 98–CV–6532, 2000 WL 637082, at *8 (E.D.Pa. May 11, 2000) (conclusory statements in briefs and expert report alone are insufficient to create a genuine issue of material fact) (citations omitted).

Professor Carmichael explained that "[w]hat GAAP requires is ... an estimate of whether a loss is probably and reasonably estimable. If those two requirements are met, then there needs to be an accrual of that amount or, in common terms, the loss has to be booked." Def. 73 (Carmichael Dep.) at 41.[19] In other words, in Carmichael's opinion GAAP requires that there be

> a general reserve and a specific reserve that in total will reduce receivables to not realizable value ... [T]he determination ... requires identifying specific accounts for which collection is not probable and for which the loss is reasonably estimable and other accounts ... that may not be able to be specifically identified.

*Id.* at 29–30. These requirements, according to Professor Carmichael, are substantively the same as what IKON's internal policy[20] required. However, this conclusion merely assumes that existence of the internal policy proves that it is intended to comply with GAAP. For example, Professor Carmichael stated that "[a] company in applying GAAP in its particular circumstances will choose an appropriate means of making that estimate [that is required by GAAP]. It is my opinion that IKON chose the policy as reflected here as the appropriate means of achieving that end."

---

ed or unreconciled accounts, and since there does not appear to be any such evidence, the claim regarding the unsupported or unreconciled accounts is not discussed.

In addition, plaintiffs distinguish between known and reckless misrepresentations. The allegedly known misrepresentation is the $4.2 million shortfall in the lease default reserve in the Southern California District; the allegedly reckless misrepresentation is the $17.0 million misstatement with respect to the accounts receivable reserves. The court recognizes that there is a difference between known and reckless misrepresentations under the law; however, in this context, the difference appears to be irrelevant and accordingly, the court makes no distinction in its analysis. The same premise underlies both the alleged known and reckless misrepresentations—that IKON policy equaled GAAP, and therefore these numbers violated GAAP.

**19.** For the formal requirement on recording loss contingencies, see Def. Ex. 10 (Devor/Carmichael Report) at ¶ 19 (citing Statement of Financial Accounting Standards # 5, Accounting for Contingencies as stating that "[l]osses from uncollectible receivables shall be accrued when BOTH of the following conditions are met: a) Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss. b) The amount of the loss can be reasonably estimated.").

**20.** IKON's policy called for accounts receivable to be divided into categories according to how many days the account was outstanding, and then required reserves covering a certain percentage of the accounts each category; following the assumption that older debts are less likely to be collected, policy required that a higher percentage of older accounts be covered by the reserves. *See* Def. Ex. 51.

*Id.* at 30. Similarly, he concluded that since other companies commonly use internal "percentage aging" policies to comply with GAAP, IKON's use of an internal "percentage aging" policy meant that IKON's policy too was created for the purpose of GAAP compliance. He stated that

> Companies ... develop their own more detailed policies on how in their circumstances they will achieve an estimate that conforms with [GAAP]. A general, say, accepted and commonly used approach to that is what is referred to generally as a percentage of aging category ... Where a company such as IKON has identified a percentage of aging policy as its internal policy, that is the way they achieve conformity with GAAP.

*Id.* at 42–43. At best, Professor Carmichael has noted a similarity in the structure of IKON's policy and those of other companies, without any facts to support the idea that substantively, a deviation from IKON's policy necessarily was a deviation from GAAP.

Plaintiff's other expert, Professor Devor, based his conclusion regarding the accounts receivable reserve on similarly unreliable assumptions. *See* Def. 74 at 186–196. Professor Devor cited IKON's policy manual's one-line description of the accounts receivable reserve allowance, which stated that "[e]ach operating unit should evaluate the collectibility of accounts receivable on no less than a quarterly basis and maintain an allowance for doubtful accounts equal to the total of certain and probably uncollectible accounts," and concluded, "yes, that is GAAP." *Id.* at 192–93. However, as explained, IKON's policy involved a particular percentage aging approach, not merely the generalized dictates set forth in the manual. Based on Professor Devor's conclusion, a jury would have no evidence as to whether a calculation that did not follow IKON's particular percentage aging approach necessarily deviated from GAAP. Professor Devor also stated that it appeared from Ernst's own workpapers and testing methods that Ernst thought that internal policy equaled GAAP, *id.* at 187–88, but no Ernst witnesses testified to believing that the internal policy equaled GAAP. *See* Def. E & Y's Mot. for Summ. J. at 37 n.15. Professor Devor further stated that testimony by Michael Royce, IKON's Northern California District CFO, indicated that he believed policy equaled GAAP, *see* Def. 74 at 187–88; however, at most, Mr. Royce suggested that in some instances, policy might equal GAAP, but that such was clearly not the case with respect to the accounts receivable allowance. *See* Def. Ex. 31 (Royce Dep.) at 387–88, 393–94, 423. Such expert testimony does not support the theory that the accounts receivable reserve violated GAAP where they violated IKON's internal policy.

### 2. Lease Default Reserves

■ The second area in which plaintiffs claim that internal policy equaled GAAP is the lease default reserves. Professor Carmichael again drew unsupported conclusions. "GAAP would require a reserve that reflected the probable and estimable amount of the loss expected on the lease portfolio. IKON had a particular way of implementing what GAAP required, and that was reflected in its accounting policy." Def. Ex. 73 at 166.

■ Professor Carmichael also estimated what he believed to be the proper lease default reserve by multiplying the chargeback rate by the balance of the lease portfolio, and that "[b]ased on my understanding of the situation that existed here, a loss of at least that amount was probable, and I believe that the method of calculation is reasonable in order to make that estimate." *Id.* at 170–71. The fact that plaintiffs' expert finds it reasonable to calculate the reserve differently is not evidence of a extreme departure from ordinary care. *See Mathews v. Centex Telemanagement, Inc.,* No. 92–1837 CAL, 1994 WL 269734, at *5 (N.D.Cal. Jun.8, 1994) (granting summary judgment despite expert's explanation of why the reserve should have been higher, since differences

of opinion are not evidence of misstatements or material omissions); *see also In re Cirrus Logic,* 946 F.Supp. at 1457 (GAAP "is not a set of rules ensuring identical treatment of identical transactions; rather it tolerates a range of reasonable treatments, leaving the choice among alternative to management," because "flexible accounting concepts do not always (or perhaps ever) yield a single correct figure.") (citations, punctuation omitted). This is especially true with respect to reserves, which are "essentially predictions about the future. The fact that a future prediction turns out to be wrong does not mean it was fraudulent when made. Because reserves are meant to be estimates of predictions of collectibility, they are fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in manner inconsistent with reasonable accounting practices." *Mathews,* 1994 WL 269734, at *6 (punctuation, citations omitted) (discussing accounts receivable reserves).

Because the expert opinions that internal policies substantively equaled GAAP are either conclusory and unsupported by facts, or are simply differences in opinion, the allegation that reserves for lease defaults and accounts receivable violated IKON's internal policy, even if true, would not provide evidence of scienter.

### G. Evidence of GAAP Violations With Respect to Specific Calculations or Procedures

The remainder of plaintiffs' evidence consists of specific examples of calculations and procedures that allegedly violated GAAP. The court first addresses one alleged "known" misrepresentation,[21] then turns to the allegations as to numerous "reckless" misrepresentations.

### 1. Allegedly Known Violation: Southern California District Inventory

■■■ Ernst's draft summary of findings for the Southern California District, issued at the close of FY97, stated that there was a "need for an adjustment" with respect to approximately $2.8 million of missing or unreconciled inventory. Pls. Ex. 21 at 1. The report warned of an "increased risk of material misstatement" if the inventory issues were not investigated and resolved, and recommended the allocation of additional resources "[c]onsidering the magnitude" of the adjustment. *Id.* A final report was not issued prior to the publication of the audit opinion, and plaintiffs claim that the issues were never resolved, causing an overstatement of $2.8 million.

The court agrees with plaintiffs that the absence of a final report could reasonably be inferred to mean that the issue was never resolved. The court also agrees that, contrary to the defendant's assertion, the failure to resolve the issue prior to the finalization of FY97 financial statements was not cured simply by IKON's promise to Ernst that any ongoing audits would not materially affect those statements. *See generally Kline,* 24 F.3d at 487 (holding that where law firm had reason to believe that the information provided to it by the

21. In addition to the known misrepresentation discussed by the court in Part IV.G.1., plaintiffs allege two other "known" misrepresentations. First, plaintiffs allege that a known failure to "eliminate" intercompany balances between the IDS and IMS units caused an overstatement of $4.1 million. For the sake of clarity, this claim is discussed by the court along with other alleged misrepresentations concerning the "elimination" of accounts, *see infra* Part IV.G.2.a., even though the other misrepresentations concerning elimination were allegedly made recklessly and not knowingly. Second, plaintiffs claim that there was a known misrepresentation involving the SAD, requiring adjustments of $6.2 million. *See supra* note 13. However, plaintiffs' experts admit that these adjustments would need to be posted only when they became material, and that they are only "material when the other components of the $54,962,000 are considered." Def. Ex. 10 at ¶ 44. As the rest of the alleged $54.9 million in misstatements are not established, the court does not address the claim regarding the allegations pertaining to the SAD.

company was materially different from the truth, firm could not escape liability merely by stating that its opinion was based solely on information provided to it). However, the relevant inquiry is not merely whether Ernst knew that there were inventory problems. *See Stamatio v. Hurco Companies, Inc.,* 892 F.Supp. 214, 218 (S.D.Ind.1995) (holding that even if defendants "knew that [the company] had inventory problems . . ., that fact standing alone does not show that Defendants knew that the statements in their prospectus or other representations were materially false or misleading at the time the material statements were made."). Rather, the relevant inquiry is whether Ernst knew that the problem presented a danger of misleading the public. *McLean,* 599 F.2d at 1197. The summary of findings memorandum shows only that Ernst warned strongly of an *increasing* risk of material misstatement *if* the inventory was not reconciled, and clearly stopped short of declaring an actual risk of misstatement as of the close of the fiscal year. Thus, the evidence does not show that Ernst knew of a risk of misstatement with respect to the missing inventory.

### 2. Allegedly Reckless Violations

What now remains are plaintiffs' allegations of individual instances of recklessness in Ernst's procedures.[22] Before addressing each individual example, the court reiterates that the alleged accounting deficiencies must be able to support an inference of scienter, as opposed to an inference of mere negligence. *McLean,* 599 F.2d at 1198. The failure to follow professional standards by itself does not necessarily establish scienter, nor does the use of unreasonable accounting procedures. *See In re Worlds of Wonder,* 35 F.3d at 1426; *In re Cirrus Logic,* 946 F.Supp. at 1460 ("Courts in this district have granted summary judgment in accounting fraud cases even where the opposing party has provided a declaration from an accountant

attesting that the accounting practices at issue did not meet the applicable professional standard.") (citations omitted); *CL–Alexanders Laing,* 739 F.Supp. at ·163 (showing of "unreasonable" accounting methods insufficient to establish scienter). Rather, the violations must be extraordinarily egregious, permitting an inference of a "pretended audit" with "no genuine belief" behind it. *See McLean,* 599 F.2d at 1197; *see generally Infinity Group Co.,* 212 F.3d at 191–92 (affirming grant of permanent injunction since defendants' reckless investing was clearly evident, where defendants invested $302,000 in a bond which had a face value of only $1000, and valued that bond at $107 million for investors).

The court also notes that an inference of scienter based solely on discrete examples of deficient accounting procedures is especially difficult to raise in light of the evidence reflecting the scope of work actually performed by Ernst. The defendant spent over 10,000 hours on the IKON account, reflecting a 20% overall increase over its original plan; this included work in IKON's Southern and Northern California Districts, where particularly troublesome accounting problems were identified, that was roughly 30% and 70% over budget, respectively. ·*See* Def. Exs. 19–21; *Danis v. USN Communications,* 121 F.Supp.2d 1183, 1195 (N.D.Ill.2000) (stating that where accounting firm "took steps to ensure the accuracy of the financial reports despite [the client's] operational deficiencies" and spent 1200 hours on the audit, such evidence "alone defeats a claim of recklessness"). Ernst conducted six full scope audits and eight specific scope audits at company units that collectively generated 50% of company's revenues. *See* Mulherin Decl. at ¶ 12; Graham Rpt.App. 3 (app. to rpt. of def.'s expert L. Graham). The number of locations visited by E & Y was deemed by Arthur Andersen to be not unreasonable or dissimilar to that which Andersen might have chosen to visit under

---

**22.** For one exception, see *infra* note 24.

the same circumstances.[23] Overall, the general scope and nature of the audit work make it difficult to raise an inference of scienter, especially in light of the highly detailed documentary evidence of ·Ernst's procedures, calculations and findings, which Ernst itself produced in the course of its audit. *See In re Software Toolworks*, 50 F.3d at 627–28 (affirming summary judgment where prospectus may not have accurately reported revenue with respect to a specific account, but accounting firm had reviewed the company's account documentation, confirmed accounts with outside vendors, and reviewed the collections progress); *In re Worlds of Wonder*, 35 F.3d at 1421–22 (affirming summary judgment as to corporate officers accused of fraudulent expansion scheme, where inference of scienter was rebutted by overall pattern of conduct because officers disclosed the risks, did not sell their own stock, and continued to invest heavily in the expansion).

The court now turns to plaintiffs' allegations of recklessness with respect to specific procedures and calculations.

### a. Elimination of Intercompany Accounts

■ As noted previously, accounting standards require the "elimination" of intercompany transactions, so that income is not inflated due to internal transactions that merely transfer profits and/or assets from one part of the company to another. *See* Pls. Ex. 8 (ARB 51) at ¶ 6 et seq. and Pls. Ex. 29 (same). Plaintiffs provide evidence that at the time the FY97 financial statements and audit opinion were issued, Ernst knew of IKON's historic problems with elimination both on a company-wide

basis, *see* Pls. Exs. 10–16 (IKON's emphatic and repeated internal warnings on the subject, issued from the fall of 1996 through the very end of FY97), and also particularly with respect to transactions between IDS and IMS. *See* Pls. Ex. 4 (E & Y's Summary Review Memorandum for IKON Document Services) ("IDS") (showing that Ernst's Houston and Philadelphia offices were aware of the recurring problem with IDS/IMS accounts); Pls. Ex. 18 (letter report dated November 28, 1997 to M. Dillon, IKON's controller) (responding to E & Y's finding that IDS had not eliminated properly); Def. Ex. 78 (L. Guinan, Ernst manager, Dep.); Pl.Ex. 17 (F. Eaton, IKON's Manager of Internal Audits, Dep.) at 110.

The last warning memorandum is dated September 24, 1997, *see* Pls. Ex. 16, and defense witnesses claim that IKON performed elimination on a consolidated basis in October 1997, which was reviewed by E & Y and found to be reasonable. *See* Def. Ex. 29 (Dep. of C. Nepa, senior Ernst manager) at 593–604; Mulherin Decl. at ¶ 26. Plaintiffs' experts counter that the absence of work papers prove that these accounts were never eliminated. *See* Def. Ex. 10 at ¶¶ 31, 62(i); Def. Ex. 73 at 363–365; Def. Ex. 74 at 24. *But see* Def. Ex. 73 at 351–52 (plaintiffs' expert explaining that under accounting principles, in at least some circumstances, work papers are not the only means of documenting audit procedures). Plaintiffs also point out that the Special Procedures confirmed that the 1997 financial statements missed approximately $7.3 million in intercompany bal-

---

**23.** As noted previously, Andersen was explicitly not permitted to opine as to the ultimate question of whether the FY97 financial statements were prepared in accordance with GAAP and did not perform an audit itself for FY97, *see supra* Part IV.E., and thus Andersen's opinion as to the integrity of the FY97 financial statements at the time that they were issued is not dispositive or even probative of the ultimate issue in this case. Andersen also could not opine on the overall quality of the audit. *See* Def. Ex. 22 at 28. However, Andersen did review the 1997 internal audit workpapers, among others, *see* Def. Ex. 22 at 9, and with respect to simply the number of locations visited by Ernst during the 1997 audit, Andersen concluded that it was "[n]ot sure we would do much differently given scope and size of the company." Pls. Ex. 20 (Andersen document entitled "1997 Workpaper Review—Overall Notes"); *see also* Def. Ex. 22 at 148–49.

ances.[24] *See* Def. Ex. 10 (Devor/Carmichael Report) at ¶ 26. However, the fact that a misstatement is discovered in hindsight is not evidence of scienter in itself. *See generally* Pls. Ex. 58 (APB Opinion No. 20) (financial statements may require correction where no wrongdoing occurred, such as where estimates change due to "new information or subsequent developments" or where innocent mistakes were made, including "mathematical mistakes, mistakes in the application of accounting principle, or oversight or misuse of facts"). Furthermore, while plaintiffs point out that Andersen "did not get a sense that the intercompany area was looked at carefully," Def. Ex. 22, such is evidence merely of negligence, not of scienter. The court finds that although it is a close question, when considered in combination, this evidence permits at most an inference of negligence and not of scienter, especially in light of IKON's and Ernst's repeated efforts to draw attention to and resolve the issue.

### b. Accounts Receivable Reserve: Southern District (Atlanta)

■ Plaintiffs also allege that the defendant improperly failed to reserve $3.7 million for accounts receivable in IKON's Southern District (Atlanta).[25] Plaintiffs' argument is based on the fact that in a memorandum dated June 30, 1997, Ernst stated that the $3.7 million reserve was required by both "IKON Group Policy *and* GAAP." Def. Ex. 61 (emphasis added). In response, the defendant notes that the very same document states that the $3.7 million reserve was calculated during testing "for compliance with IKON Group Policy," *id.*, without reference to GAAP, and points to testimony of the responsible Ernst auditor that the $3.7 million was required for internal policy alone, and not for GAAP. *See* Def. Ex. 44 at 24–25 (J. McElderry, Ernst auditor, explaining that IKON's policy was more conservative than GAAP, so that compliance with policy was sufficient, but not necessary, to ensure compliance with GAAP). Plaintiffs further point to Ernst's statement that "no improvements occurred" between June 30 and year-end, *see* Def. Ex. 20 at 44, and claim that Ernst nevertheless reduced the reserve from $3.7 million to $0.5 million. *See* Def. Ex. 44 at 89–91. Defendant avers that the reserve calculation was ultimately deferred until year-end, and that the reduction to $0.5 million was based on work performed on a consolidated basis. *See* Def. Ex. 44 at 68–74; Def. Ex. 20. Plaintiffs, in turn, counter that the work was never conducted on a consolidated level, *see* Def. Ex. 22 (recalling no documentation supporting reserves calculations done on a consolidated level), but rather that Ernst improperly reduced the reserved solely based on the representations of an IKON manager. *See* Def. Ex. 44 at 89–91;

---

24. Plaintiffs' figures vary slightly, but plaintiffs claim that the Special Procedures confirmed misstatement of approximately $7.2 or $7.3 million due to the failure to eliminate intercompany accounts. The total figure includes approximately $4.1 million identified at specifically at IDS/IMS (an allegedly known misrepresentation) and approximately $3.2 million in other intercompany balances (an allegedly reckless misrepresentation). It appears that the "known" violation is distinguished from the "reckless" violations based on the fact that, with respect to the former, two documents were issued by Ernst that strongly emphasized the need to eliminate accounts specifically at IDS/IMS, Pls. Exs. 4 and 18, while with respect to the latter, documents were issued within IKON that discussed the need to eliminate more generally or on a company-wide basis. Pls. Exs. 10–16. As stated *supra* at note 21, these known and reckless violations are addressed together for the sake of clarity under the more lenient standard of recklessness.

25. As discussed previously, some of plaintiffs' claims regarding the accounts receivable reserves are based on the theory that the reserves violated GAAP simply because they violated internal policy. *See supra* Part IV.F. However, in the case of the accounts receivable reserve in the Southern District, plaintiffs appear to provide an alternate independent theory to support the contention that the reserve violated GAAP. Thus, the court discusses this alleged misstatement in the context of this alternate theory as well.

Pls. Ex. 27 (AU 333, issued by the AICPA and entitled "Management Representations") (forbidding substitution of management representations for proper auditing procedures).

The court finds that in light of the evidence presented, there are question of facts as to whether the $3.7 million reserved was required by GAAP and, if so, whether the reserve was reduced on improper grounds. However, assuming both that the larger reserve was required by GAAP and that the reduction was improperly based on management representations alone, the court finds that a jury could not infer based on this evidence, alone or in conjunction with other evidence, that Ernst issued its audit opinion "without a genuine belief or reasonable basis." *Kline,* 24 F.3d at 486. This is especially true in light of the fact that discrete GAAP violations on the district level, while not irrelevant to scienter, must be placed into context with respect to Ernst's audit opinion on the consolidated or company-wide financial statements.

### c. *Accounts Receivable Reserve: Northern California District*

With respect to the accounts receivable in the Northern California District[26], there is no dispute that the computers systems in place were not capable of properly assessing the accounts receivable reserves. What is in dispute is whether the steps taken by Ernst in place of relying on the deficient computer system were so deficient as to raise a reasonable inference of scienter. IKON's director of internal audit, Daryle Yergler, ran tests and conducted interviews to assess approximately 100 accounts receivable; Ernst auditors then interviewed IKON employees with respect to about 10 of those accounts. *See* Pls. Ex. 36 (summary review memorandum dated September 30, 1997) (providing detailed description of Ernst's procedures in the Northern California District; Pls. Ex. 40 (entitled "Accounts Receivable Analysis—Retesting of IKON's Audit Procedures") (same).

Plaintiffs complain that the procedures performed violated certain accounting principles, for example, by failing to corroborate IKON's information with outside sources. *See* Pls. Exs. 27 (AU 333) (forbidding substitution of management representations for proper auditing procedures); Pls. Ex. 39 (E. Kennedy, Ernst's field auditor, Dep.) (stating that Kennedy could not recall obtaining independent confirmation of managements' representations); Pls. Ex. 34 (Overall Summary Conclusion Memorandum dated March 31, 1997) (describing Ernst's procedures, apparently based solely on management representations); Deft. 10 (plaintiffs' expert report listing Northern California procedures as a "blatant" example of a failure to obtain competent evidential matter). However, GAAP violations, without more, do not raise an inference of scienter. Furthermore, any inference raised in this instance is clearly rebutted by Ernst's summary review memorandum, which, when read in its entirety, shows that whatever mistakes it may have made in judgment or process, Ernst put forth a good-faith effort in its Northern California audit. *See* Pls. Ex. 36; *see also* Def. 21 (showing that Ernst performed 70% more work than originally budgeted in the Northern California District). The summary review memorandum sets forth in precise detail the problems encountered and the steps taken to address them or compensate for them. Pls. Ex. 36. It readily admits that Ernst was "unable to test and conclude on the allowance at June 30, 1997," *id.,* but then details the procedures undertaken to make up for that failure and shows that where Ernst

---

**26.** Again, some of plaintiffs' claims regarding the accounts receivable reserves are based on the theory that the reserves violated GAAP simply because they violated internal policy. *See supra* Part IV.F. However, in this particular instance, plaintiffs provide independent evidence of reckless conduct. Thus, the court discusses this alleged misstatement in the context of this alternate theory.

disagreed with IKON's own testing, it compensated for the disagreement. *Id.* (where Ernst found that IKON's approach did not take into account all relevant factors, such as untimely billing, E & Y proposed an increase in the estimated write-off factor of 25%). Under the circumstances, the evidence of Ernst's procedures with respect to the Northern California accounts receivable reserve does not, alone or in concert with other evidence, raise an inference of scienter.

## V. Conclusion

For the foregoing reasons, summary judgment is granted.

An appropriate Order follows.

### ORDER

**AND NOW,** this 6th day of February, 2001, upon consideration of Ernst & Young's Motion for Summary Judgment (doc. 139), the response and the reply thereto, and after a hearing, it is hereby **ORDERED** that the motion is **GRANTED.**